

# Office of the Attorney General
## State of Texas

DAN MORALES
ATTORNEY GENERAL

March 10, 1995

Honorable Kenny Marchant
Chair
Committee on Investments and Banking
Texas House of Representatives
P.O. Box 2910
Austin, Texas 78768-2910

Opinion No. DM-332

Re: Whether certain subordinated debt of a pawnshop must be included in the calculation of net assets for purposes of determining eligibility for a pawnshop license under the Texas Pawnshop Act, V.T.C.S. tit. 79, ch. 51 (RQ-724)

Dear Representative Marchant:

You have asked whether certain subordinated debts constitute applicable liabilities that must be included in the calculation of net assets for purposes of the Texas Pawnshop Act (the "act"), V.T.C.S. tit. 79, ch. 51. Under the act, no person may engage in business as a pawnbroker unless the person has received a license from the Consumer Credit Commission.[1] V.T.C.S. art. 5069-51.03(a). To be eligible for a pawnshop license, an applicant must, among other things, "have net assets of at least $150,000 readily available for use in conducting the business of each licensed pawnshop."[2] Id. art. 5069-51.03A(a)(2). Pursuant to article 5069-51.02(g),

> "[n]et assets"--means the book value of the current assets of a person or pawnbroker less its applicable liabilities as stated in this

---

[1]The purpose of the act is to

> (1) exercise the state's police power to ensure a sound system of making pawn loans and acquiring and disposing of tangible personal property by and through pawnshops and to prevent unlawful property transactions, particularly in stolen property, through licensing and regulating pawnbrokers and certain persons employed by or in pawnshops;

> (2) provide for licensing fees, investigation fees, and minimum capital requirements of licensees;

> (3) ensure financial responsibility to the state and the public;

> (4) ensure compliance with federal, state, and local laws, rules, regulations, and ordinances; and

> (5) assist local governments in the exercise of their police power.

V.T.C.S. art. 5069-51.01A.

[2]A pawnbroker must receive a separate license for each place of business. See V.T.C.S. art. 5069-51.06(a).

subsection. Current assets include the investment made in cash, bank deposits, merchandise inventory, and loans due from customers excluding the pawn service charge. Current assets do not include the investments made in fixed assets of real estate, furniture, fixtures, or equipment; investments made in stocks, bonds, or other securities; or investments made in prepaid expenses or other general intangibles. Applicable liabilities include trade or other accounts payable; accrued sales, income, or other taxes; accrued expenses; and notes or other payables that are unsecured or secured in whole or part by current assets. Applicable liabilities do not include liabilities secured by assets other than current assets. Net assets must be represented by a capital investment unencumbered by any liens or other encumbrances to be subject to the claims of general creditors. . . .

The Office of the Consumer Credit Commissioner has promulgated a rule[3] explaining the method by which it calculates an applicant's or a licensee's net assets:

An applicant or licensee's net assets is the sum of cash on hand, bank deposits, the value of merchandise inventory held for sale in the pawnshop or to be held for sale in the pawnshop, and the amount of money loaned on open pawn loans receivable less any and all unsecured debts, and debts secured in whole or part by the previously listed assets. Assets must be available for use in the pawnshop business to be acceptable.

7 T.A.C. § 85.2(a)(2)(A).

You have described a hypothetical situation similar to a situation you understand to occur with increasing frequency. You establish that a pawnshop has current assets of $160,000, and with the exception of its subordinated debt, the pawnshop has no applicable liabilities. You continue by advising that the pawnshop has borrowed from and owes money to a bank in the amount of $100,000. The pawnshop has executed a security agreement and financing statement to the bank, covering all of the business's assets. Simultaneously with the execution of the security agreement and financing statement, the pawnshop and the bank executed a subordination agreement.

Under the subordination agreement, you state that the bank agrees to subordinate any lien or claim it might have to permit the pawnshop to meet the act's net asset requirement. The subordination agreement provides that any lien or claim of the bank to the assets of the pawnshop always will be subordinate to the $150,000 net asset requirement and subordinate to the right of general creditors to have first claim to the first $150,000 of net assets of the pawnshop. You indicate that subordination agreements come in various

---

[3]Article 5069-51.09(b), V.T.C.S., authorizes the Consumer Credit Commissioner to adopt regulations necessary for the enforcement of the act and consistent with the act's provisions.

forms with various requirements, but all of the subordination agreements of which you are aware do not vary in their basic thrust: a lender who would otherwise be secured (by current assets) or a general creditor has agreed to subordinate its debt and any claim it might have against the current assets of the pawnshop to permit the pawnshop to meet the act's net asset requirement.

If the debt that is the subject of the subordination agreement is not an applicable liability for purposes of determining the pawnshop's net assets under V.T.C.S. article 5069-51.02(g), then the pawnshop has sufficient net assets to be eligible for a pawnshop license. *See* V.T.C.S. art. 5069-51.03A(a)(2). If, on the other hand, the debt is an applicable liability, then the net assets of the pawnshop in the hypothetical you have described are insufficient to qualify for licensure under the act. *See id.* You ask us to construe the definition of "net assets" provided in section 51.02(g) to determine whether a subordinated debt such as you describe is an applicable liability.

The legislature amended the act in 1981, adding the statement of purpose and the definition of net assets, among other things. *See* Act of April 27, 1981, 67th Leg., ch. 99, § 2, 1981 Tex. Gen. Laws 221, 221-22. The legislature had enacted a substantially similar definition of net assets in 1979, *see* S.B. 166, 66th Leg., R.S. (1979), but the governor vetoed the bill. In 1979 Representative Laney, house sponsor of Senate Bill 166, explained to the House Committee on Financial Institutions that the bill "tightened up" the act. *Hearings on S.B. 166 Before the House Comm. on Financial Institutions, 66th Leg.* (Feb. 27, 1979) (tape available from House Video/Audio Services) (statement of Representative Laney). According to a witness who spoke at the hearing, at that time the act required pawnbrokers and applicants to have net assets in the amount of $25,000, but the act did not define "net assets." *Id.* (statement of William R. Pakis, representing the Texas Pawn Brokers Association). An unidentified representative stated that the bill defined the term "net assets" in terms of assets that a pawnbroker might liquidate quickly to give to a consumer. *Id.; see also id.* (statement of unidentified representative explaining that S.B. 166 is consumer oriented).

In interpreting a statute, a court diligently must attempt to ascertain legislative intent. Gov't Code § 312.005; *see* 67 TEX. JUR. 3D *Statutes* § 91, at 651-52 (1989) (and sources cited therein). Upon examining the legislative history, we see that the legislature meant by the term "net assets" to describe assets of a pawnshop business that a pawnbroker might liquidate quickly to make available to a consumer.

In this regard, we note that article 5069-51.03A(a), which provides requisites for eligibility for a pawnshop license, includes a mandate that an applicant for a license have net assets of at least $150,000 "readily available for use in conducting the business of each licensed pawnshop." We further note that, for purposes of calculating an applicant's or licensee's net assets, the act lists as current assets items easily liquidated. *See* V.T.C.S. art. 5069-51.02(g). The act explicitly excludes items that may be difficult to liquidate: "investments made in fixed assets of real estate, furniture, fixtures, or equipment; investments made in stocks, bonds, or other securities; or investments made in prepaid

expenses or other general intangibles." *Id.*   Likewise, applicable liabilities include liabilities secured by current assets, which would hinder the quick liquidation of the assets. *See id.*

Ordinarily, different liens on the same property have priority in the time of their creation.  50 TEX. JUR. 3D *Liens* § 12, at 299 (1986) (and authorities cited therein). Parties may vary the common practice by contract, however.  *See id.* at 299-300.  A subordination agreement is a contractual modification of lien priorities.  *ITT Diversified Credit Corp. v. First City Capital Corp.*, 737 S.W.2d 803, 804 (Tex. 1987); *Western Auto Supply Co. v. Brazosport Bank*, 840 S.W.2d 157, 159 (Tex. App.--Houston [1st Dist.] 1992, no writ) (citing *ITT Diversified Credit Corp.*).  Accordingly, such an agreement must be construed consistent with the parties' expressed intention as well as the terms of the agreement itself.  *ITT Diversified Credit Corp.*, 737 S.W.2d at 804; *Western Auto Supply Corp.*, 840 S.W.2d at 159 (citing *ITT Diversified Credit Corp.*).

From your description of the subordination agreement and from the information we have found, it appears that a bank forfeits its security priority to current assets of the pawnshop in the amount of $150,000.  It also would appear that the bank forfeits any rights it may have as an unsecured creditor to current assets in the amount of $150,000.  If these assumptions are true, a subordination agreement would not render a pawnshop's current assets unavailable for use in the pawnshop business, *see* V.T.C.S. art. 5069-51.03A(a)(2); 7 T.A.C. § 85.2(a)(2)(A), nor would it hinder a pawnshop's ability quickly to liquidate its assets.  Thus, debt that is subject to a subordination agreement such as you describe would not be an applicable liability for purposes of calculating a pawnshop's net assets under article 5069-51.02(g), V.T.C.S.

We do not construe contracts in the opinion process, however.  Attorney General Opinions DM-192 (1992) at 10; JM-697 (1987) at 6.  Additionally, we cannot resolve fact questions in the opinion process.  *See, e.g.*, Attorney General Opinions DM-98 (1992) at 3; H-56 (1973) at 3; M-187 (1968) at 3; O-2911 (1940) at 2.  Thus, we are unable to determine whether, in a particular case, a debt subject to a particular subordination agreement actually is an unsecured debt or a debt secured in whole or part by a pawnshop's current assets.

## S U M M A R Y

Assuming that under a subordination agreement, a bank forfeits its security priority as well as any rights it may have as an unsecured creditor to current assets of a pawnshop-borrower in the amount of $150,000, a subordination agreement would not render the pawnshop's current assets unavailable for use in the pawnshop business. Accordingly, debt that is subject to a lender's subordination agreement generally is not an applicable liability for the purpose of calculating the pawnshop's net assets under V.T.C.S. article 5069-50.02(g).

Yours very truly,

DAN MORALES
Attorney General of Texas

JORGE VEGA
First Assistant Attorney General

SARAH J. SHIRLEY
Chair, Opinion Committee

Prepared by Kymberly K. Oltrogge
Assistant Attorney General